No. 20-1618

In the

# United States Court of Appeals
## For the Third Circuit

FRESENIUS KABI USA, LLC,

*Appellant,*

v.

PAR STERILE PRODUCTS, LLC and
PAR PHARMACEUTICAL COMPANIES, INC.,

*Appellees.*

On Appeal From the United States District Court For the
District of New Jersey
The Honorable Susan D. Wigenton, District Judge

## APPELLEES' ANSWERING BRIEF

Benjamin G. Bradshaw
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

Stephen J. McIntyre
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, Cal. 90071
(213) 430-6000

Brett J. Williamson
Anton Metlitsky
Carolyn Wall
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, N.Y. 10036
(212) 326-2000

*Counsel for Appellees Par Sterile Products, LLC and
Par Pharmaceutical Companies, Inc.*

## United States Court of Appeals for the Third Circuit

## Corporate Disclosure Statement and Statement of Financial Interest

No. 20-1618
_____

Fresenius Kabi USA, LLC

v.

Par Sterile Products, LLC and Par Pharmaceutical Companies, Inc.

Instructions

        Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

        Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

        In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

        The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

        The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

        If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Par Sterile Products, LLC and Par Pharmaceutical Companies, Inc.
_____
(Name of Party)

     1) For non-governmental corporate parties please list all parent corporations: Endo International plc indirectly wholly owns Par Pharmaceutical Companies, Inc., which wholly owns Par Pharmaceutical, Inc., which wholly owns JHP Group Holdings, LLC, which wholly owns JHP Acquisition, LLC, which wholly owns Par Sterile Products, LLC.

     2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

Endo International plc is a publicly held company that has no parent corporation, and is the only publicly held company that owns 10% or more of the stock of Par Pharmaceutical Companies, Inc. or Par Sterile Products, LLC.

     3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

     4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

/s/ Brett J. Williamson
_____
(Signature of Counsel or Party)

Dated: 8/31/2020
_____

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

COUNTER-STATEMENT OF THE ISSUES ............................................. 5

RELATED CASES ............................................................... 6

STATEMENT OF THE CASE ....................................................... 6

    I.    LEGAL AND FACTUAL BACKGROUND ............................... 7

        A.    The FDA Approval Process ............................................ 7

        B.    The FDA Encouraged Companies to Seek Approval For Vasopressin Injection ............................ 8

        C.    Fresenius Lost the "Foot Race" to Obtain FDA Approval For Vasopressin Injection ........................... 9

        D.    Par Committed to Supply the Entire U.S. Market .... 10

            1.    ████████████████████████ ............................... 10

            2.    ████████████████ ............................... 12

        E.    Enticed By Vasostrict, Fresenius Pursued an ANDA ................................................................ 13

        F.    Fresenius Did Not Compete For BCN's API Supply ............................................................... 13

        G.    Fresenius Did Not Diligently Pursue API Sources .... 16

        H.    Seven Other Companies Developed Vasopressin Injection ............................................................ 17

        I.    Par Patented Its Novel Vasostrict Formulations ....... 18

        J.    ███████████████████ ...................................... 19

    II.    PROCEDURAL HISTORY AND DECISION BELOW ....... 19

STANDARD OF REVIEW ........................................................ 21

SUMMARY OF THE ARGUMENT .................................................. 22

ARGUMENT ................................................................... 25

    I.    PAR DID NOT CAUSE FRESENIUS'S CLAIMED INJURY .......................................................... 25

# TABLE OF CONTENTS
## (*continued*)

**Page**

A.    The District Court Correctly Held That Par's
Patents Defeat Causation As a Matter of Law ........... 26

B.    Fresenius's Contrary Contention Is Based
Entirely On a Misreading of This Court's
Precedent ....................................................................... 28

C.    Fresenius's Speculative Theory of Causation Is
Insufficient to Defeat Summary Judgment ................ 34

    1.    Fresenius's Non-Infringement Arguments
Are Speculative ..................................................... 35

        a.    Fresenius's Hypothetical Product Is
Speculative ................................................. 35

        b.    Tarantino's Non-Infringement
Opinions Are Speculative and Legally
Deficient ...................................................... 39

    2.    Fresenius's Invalidity Arguments Are
Speculative ............................................................. 41

        a.    Fresenius's Failure to Pursue IPR
Defeats Causation ..................................... 42

        b.    Tarantino's Invalidity Opinions Are
Speculative and Legally Erroneous .......... 43

    3.    Fresenius's Hypothetical Litigation
Predictions Are Speculative ................................ 46

II.    FRESENIUS HAS NOT SUFFERED ANTITRUST
INJURY ................................................................................ 49

A.    Fresenius Had Every Opportunity to Compete .......... 50

B.    None of Fresenius's Excuses Matter ........................... 52

C.    The District Court Did Not Weigh Evidence .............. 55

III.    PAR DID NOT SUBSTANTIALLY FORECLOSE
COMPETITION .................................................................. 56

A.    There Is No Evidence That Par Controlled a
Substantial Percentage of Vasopressin API ............... 58

# TABLE OF CONTENTS
## (*continued*)

**Page**

B.    The Undisputed Evidence Shows That
Other Companies Had Ready Access To
Vasopressin API ........................................................... 62

IV.    FRESENIUS DID NOT ADDUCE EVIDENCE OF
TORTIOUS INTERFERENCE ........................................... 65

CONCLUSION ....................................................................... 67

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.,*
705 F.2d 1203 (10th Cir. 1982) ............................................................. 53

*Abbott Labs. v. Sandoz, Inc.,*
566 F.3d 1282 (Fed. Cir. 2009) ............................................................. 39

*Advo, Inc. v. Phila. Newspapers, Inc.,*
51 F.3d 1191(3d Cir. 1995) ............................................................. 34, 48

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP,*
592 F.3d 991 (9th Cir. 2010) ............................................................. 63

*Amarel v. Connell,*
102 F.3d 1494 (9th Cir. 1996) ............................................................. 32

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................. 30

*Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp.,*
786 F.2d 564 (3d Cir. 1986) ............................................................. 56

*Ashton v. Whitman,*
94 F.App'x 896 (3d Cir. 2004) ............................................................. 54

*AstraZeneca LP v. Apotex, Inc.,*
633 F.3d 1042 (Fed. Cir. 2010) ............................................................. 41

*Atl. Richfield Co. v. USA Petrol. Co.,*
495 U.S. 328 (1990) ............................................................. 50

*Blair v. Scott Specialty Gases,*
283 F.3d 595 (3d Cir. 2002) ............................................................. 37

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,*
140 F.3d 494 (3d Cir. 1998) ............................................................. 60

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993) ............................................................. 35, 48

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*C.R. Bard, Inc. v. Wordtronics Corp.*,
561 A.2d 694 (N.J. Super. Ct. Law Div. 1989) ..................................... 66

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) ........................................................................ 50, 51

*Cascade Cabinet Co. v. W. Cabinet & Millwork Inc.*,
710 F.2d 1366 (9th Cir. 1983) ............................................................ 59

*Chavarriaga v. N.J. Dep't of Corr.*,
806 F.3d 210 (3d Cir. 2015) ............................................................... 22

*Christofferson Dairy, Inc. v. MMM Sales, Inc.*,
849 F.2d 1168 (9th Cir. 1988) ............................................................ 62

*City of N.Y. v. Group Health Inc.*,
649 F.3d 151 (2d Cir. 2011) ............................................................... 62

*City of Pittsburgh v. W. Penn Power Co.*,
147 F.3d 256 (3d Cir. 1998) ........................................................ passim

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................... 32

*Davis v. Brouse McDowell, L.P.A.*,
596 F.3d 1355 (Fed. Cir. 2010) ......................................................... 32

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016) ........................................... 48, 56, 62, 65

*EKR Therapeutics, Inc. v. Sun Pharm. Indus., Ltd.*,
633 F.Supp.2d 187 (D.N.J. 2009) ...................................................... 41

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
301 F.Supp.2d 612 (S.D. Tex. 2003) .................................................. 55

*Ethypharm S.A. Fr. v. Abbott Labs.*,
707 F.3d 223 (3d Cir. 2013) ......................................................... 42, 43

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*,
848 F.2d 976 (9th Cir. 1989) .................................................................. 53

*Freeman v. Pittsburgh Glass Works, LLC*,
709 F.3d 240 (3d Cir. 2013) .................................................................. 32

*Gen. Bus. Sys. v. N. Am. Philips Corp.*,
699 F.2d 965 (9th Cir. 1983) .................................................................. 58

*Glaxo, Inc. v. Novapharm, Ltd.*,
110 F.3d 1562 (Fed. Cir. 1997) .............................................................. 35

*Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992) .................................................................. 26

*Honeywell Int'l, Inc. v. United States*,
609 F.3d 1292 (Fed. Cir. 2010) .............................................................. 46

*Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*,
659 A.2d 904 (N.J. Super. Ct. App. Div. 1995) .................................. 66

*In re Androgel Antitrust Litig.*,
2018 WL 2984873 (N.D. Ga. 2018) ...................................................... 20

*In re Cyclobenzaprine Hydrochloride Extended-Release
Capsule Patent Litig.*, 676 F.3d 1063 (Fed. Cir. 2012) ...................... 44

*In re Loestrin 24 Fe Antitrust Litig.*,
433 F.Supp.3d 274 (D.R.I. 2019) .......................................................... 49

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
2018 WL 563144 (D. Mass. 2018) ........................................................ 49

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) ...................................... 34

*In re Wellbutrin XL Antitrust Litig.*,
868 F.3d 132 (3d Cir. 2017) ...................................................... passim

*Jackson v. Danberg*,
594 F.3d 210 (3d Cir. 2010) .................................................................. 38

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Jupiter v. Ashcroft,*
  396 F.3d 487 (1st Cir. 2005) ............................................................... 39

*Lamorte Burns & Co. v. Walters,*
  770 A.2d 1158 (N.J. 2001) .................................................................. 66

*Lava Trading, Inc. v. Sonic Trading Mgmt., LLC,*
  445 F.3d 1348 (Fed. Cir. 2006) ......................................................... 35

*LePage's, Inc. v. 3M,*
  324 F.3d 141 (3d Cir. 2003) ............................................................... 57

*Life Techs., Inc. v. Clontech Labs., Inc.,*
  224 F.3d 1320 (Fed. Cir. 2000) ......................................................... 44

*Markman v. Westview Instruments, Inc.,*
  517 U.S. 370 (1996) ............................................................................ 33

*McCabe v. Ernst & Young, LLP,*
  494 F.3d 418 (3d Cir. 2007) ............................................................... 21

*Medtronic, Inc. v. Mirowski Family Ventures, LLC,*
  571 U.S. 191 (2014) ............................................................................ 40

*Mintz v. Dietz & Watson, Inc.,*
  679 F.3d 1372 (Fed. Cir. 2012) ......................................................... 45

*Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,*
  139 F.3d 877 (Fed. Cir. 1998) ........................................................... 44

*Murphy v. Mo. Dep't of Corr.,*
  372 F.3d 979 (6th Cir. 2009) ............................................................. 54

*Mylan Inc v. SmithKline Beecham Corp.,*
  723 F.3d 413 (3d Cir. 2013) ............................................................... 66

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.,*
  838 F.3d 421 (3d Cir. 2016) ............................................................... 48

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*Nash v. Raun,*
  149 F.2d 885 (3d Cir. 1945) ............................................................. 49

*Nat'l Soc'y of Prof'l Eng'rs v. United States,*
  435 U.S. 679 (1978) ....................................................................... 55

*Network Commerce, Inc. v. Microsoft Corp.,*
  422 F.3d 1353 (Fed. Cir. 2005) ...................................................... 39

*Novartis Pharm. Corp. v. West-Ward Pharm. Int'l Ltd.,*
  287 F.Supp.3d 505 (D. Del. 2017) .................................................. 46

*Orson, Inc. v. Miramax Film Corp.,*
  79 F.3d 1358 (3d Cir. 1996) ........................................................... 60

*Par Pharm., Inc. v. Sandoz, Inc.,*
  2020 WL 1130387 (D.N.J. 2020)..................................................... 46

*Printing Mart–Morristown v. Sharp Elecs. Corp.,*
  563 A.2d 31 (N.J. 1989) ............................................................ 65, 66

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
  124 F.3d 430 (3d Cir. 1997) ........................................................... 60

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.,*
  614 F.3d 57 (3d Cir. 2010) .................................................. 51, 52, 53

*Resolution Tr. Corp. v. Fidelity & Deposit Co. of Md.,*
  205 F.3d 615 (3d Cir. 2000) ........................................................... 21

*Roger Whitmore's Auto. Servs., Inc. v. Lake Cty.,*
  424 F.3d 659 (7th Cir. 2005)........................................................... 65

*Roland Mach. Co. v. Dresser Indus., Inc.,*
  749 F.2d 380 (7th Cir. 1984)........................................................... 56

*Ryko Mfg. Co. v. Eden Servs.,*
  823 F.2d 1215 (8th Cir. 1987)......................................................... 64

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*Shields v. Zuccarini,*
  254 F.3d 476 (3d Cir. 2001) ............................................................. 27

*SmithKline Corp. v. Eli Lilly & Co.,*
  575 F.2d 1056 (3d Cir. 1978) ....................................................... 58, 60

*Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.,*
  63 F.3d 1267 (3d Cir. 1995) ............................................................ 35

*Tampa Elec. Co. v. Nashville Coal Co.,*
  365 U.S. 320 (1961) ........................................................................ 56

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.,*
  959 F.2d 468 (3d Cir. 1992) ............................................................ 26

*Tse v. Ventana Med. Sys., Inc.,*
  297 F.3d 210 (3d Cir. 2002) ....................................................... 28, 37

*Tundo v. Cty. of Passaic,*
  923 F.3d 283 (3d Cir. 2019) ............................................................ 21

*Tunis Bros. Co. v. Ford Motor Co.,*
  952 F.2d 715 (3d Cir. 1991) ............................................................ 59

*United Food & Commercial Workers Local 1776 v. Teikoku
  Pharma USA*, 296 F.Supp.3d 1142 (N.D. Cal. 2017) ....................... 49

*United States v. Dentsply Int'l, Inc.,*
  399 F.3d 181 (3d Cir. 2005) ....................................................... 57, 58

*United States v. Fulton,*
  837 F.3d 281 (3d Cir. 2016) ............................................................ 37

*United States v. Line Material Co.,*
  333 U.S. 287 (1948) ........................................................................ 55

*United States v. Pelullo,*
  399 F.3d 197 (3d Cir. 2005) ............................................................ 65

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
   873 F.3d 185 (3d Cir. 2016) ........................................43, 48

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ...................................................31, 47

*Williams v. Borough of W. Chester*,
   891 F.2d 458 (3d Cir. 1989) ...........................................38

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ...................................... passim

## Statutes

21 U.S.C. § 355(j) ..............................................................7

21 U.S.C. § 355(j)(5)(B)(iv)(I) ....................................................38

35 U.S.C. § 271(b) ...........................................................41

35 U.S.C. § 282..............................................................41

35 U.S.C. § 311(b) .......................................................42, 43

## Regulations

21 C.F.R. § 314.3(b) .........................................................18

21 C.F.R. § 314.50(d)(1) ........................................................7

21 C.F.R. § 314.94(a)(9) ........................................................7

## Other Authorities

Areeda & Hovenkamp, *Antitrust Law* (2020 supp.)................................57

## GLOSSARY

| | |
|---|---|
| ANDA | Abbreviated New Drug Application |
| API | Active pharmaceutical ingredient |
| App.Br. __ | Appellant's Opening Brief, page __ |
| Bachem | Bachem Americas, Inc. |
| BCN | BCN Peptides |
| D.E. __ | Docket Entry No. __, in *Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC, et al.*, Civ. No. 16-4544 (SDW) (LDW) (D.N.J.) |
| DMF | Drug Master File |
| FDA | U.S. Food and Drug Administration |
| FDCA | Federal Food, Drug, and Cosmetic Act |
| Fresenius | Appellant Fresenius Kabi USA, LLC |
| Hatch-Waxman Act | Drug Price Competition and Patent Term Restoration Act |
| IPR | *Inter partes* review |
| __JA__ | Volume __ of the Joint Appendix, page __ |
| LOA | Letter of Authorization |
| NDA | New Drug Application |
| Op. __ | Opinion, page __, *Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC, et al.*, Civ. No. 16-4544 (SDW) (LDW) (D.N.J. Feb. 25, 2020), included in Joint Appendix at 1JA1-12 |
| *Orange Book* | *Approved Drugs With Therapeutic Equivalence*, an FDA publication that lists |

|                       | FDA-approved drug products and any related patents |
|-----------------------|----------------------------------------------------|
| Par                   | Appellees Par Sterile Products, LLC and Par Pharmaceutical Companies, Inc., collectively |
| PolyPeptide           | PolyPeptide Laboratories Sweden AB                 |
| POSA                  | Person of ordinary skill in the art                |
| PTAB                  | Patent Trial and Appeal Board                      |
| RLD                   | Reference Listed Drug                              |
| Vasopressin injection | Vasopressin solution for intravenous injection     |
| Vasopressin API       | Active pharmaceutical ingredient used in vasopressin injection |

# INTRODUCTION

Fresenius alleges that Par prevented it from entering the market for vasopressin injection by negotiating exclusive agreements with suppliers of the active pharmaceutical ingredient (API) needed to manufacture the product. That is wrong as a factual matter, but any disputes about Par's conduct make no difference here. What does matter, as the district court recognized, is that Par holds several patents that bar Fresenius's market entry, independent of any alleged anticompetitive conduct. Under this Court's precedent, those patents preclude Fresenius from proving causation as a matter of law.

To avoid this conclusion, Fresenius tries to rewrite history. Fresenius argues that, but for Par's alleged conduct, it would have:

- filed for FDA approval of a hypothetical vasopressin injection product that is different from the *actual* product Fresenius developed and submitted to the FDA;

- overcome Par's patent infringement claims in hypothetical litigation or, alternatively, proven in hypothetical litigation or *inter partes* review (IPR) proceedings that Par's patents are invalid;

- prevailed in a hypothetical appeal to the Federal Circuit; and

- received FDA approval for its hypothetical product, allowing it to enter the market.

The district court rejected these "unduly speculative" assertions and granted summary judgment for Par. Op. 6-12. That decision is consistent with the well-settled rule that speculation does not create a genuine dispute of material fact and cannot defeat summary judgment.

Fresenius's main argument is that *In re Wellbutrin XL Antitrust Litigation*, 868 F.3d 132 (3d Cir. 2017), requires that a jury decide how Fresenius's hypothetical patent proceedings would have turned out. *Wellbutrin* says no such thing. The plaintiffs there contended that, but for the alleged antitrust violations, a generic pharmaceutical company would have prevailed in patent litigation and come to market sooner. Rather than submitting the question to a jury, this Court *affirmed* summary judgment for the defendants, holding that the plaintiffs' speculation did not create a genuine dispute of material fact. *Wellbutrin* reaffirmed that normal summary judgment rules apply in antitrust cases, and that conjecture about hypothetical litigation outcomes is no ticket to trial.

If anything, Supreme Court and Third Circuit precedent make clear that, because it is nearly impossible for a jury to predict how another lawsuit might be resolved, courts must rigorously apply the summary judgment standard when a plaintiff's claim turns on the outcome of a

hypothetical case. This is particularly true of patent litigation, given its notorious complexity and dependence on claim construction—a responsibility the Supreme Court vests in judges due to the fact that they are substantially better suited than juries to perform it.

There may be cases in which a plaintiff produces sufficiently concrete evidence of hypothetical litigation outcomes to submit the question to a jury. This case, like *Wellbutrin*, is not one of them. The many failings in Fresenius's and its experts' speculations are detailed at length below, but two examples suffice to demonstrate the point.

*First*, Fresenius's non-infringement argument hinges on the assertion that, but for Par's alleged conduct, Fresenius would have sought approval for a vasopressin injection formulation ████████████ from the formulation it actually developed. ████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████. But there is no evidence Fresenius would have pursued this hypothetical product rather than the product it developed in the real world.

*Second*, Fresenius's experts say it would have had a 90-percent chance of invalidating Par's patents, yet Fresenius decided not to pursue IPR, a procedure Congress established to encourage efficient invalidation of the sort of weak patents Fresenius says exist here. If Par's patents are so clearly invalid, as Fresenius claims, Fresenius could have invalidated them. Its decision not to breaks the chain of causation and defeats Fresenius's claims. It also gives the lie to Fresenius's experts' baseless prediction that Fresenius would have invalidated Par's patents in an alternate universe. Perhaps unsurprisingly, Fresenius's invalidity arguments are riddled with legal errors. For instance, instead of starting with prior art and showing that it would have rendered Par's inventions obvious, as patent law requires, Fresenius begins with Par's inventions and works backward—a disqualifying error that infects the whole analysis.

The district court rightly concluded that Fresenius's speculative theories cannot defeat summary judgment. That is reason enough to affirm the judgment, but it is not the only reason. For example, the undisputed evidence shows that Fresenius's failure to obtain API was a consequence of its own decisions. That is not the type of "injury" the antitrust

laws remedy. And Fresenius does not offer any evidence that Par fore-closed competitors' access to vasopressin API generally, which inde-pendently defeats Fresenius's claims.

For these and the other reasons set forth in detail below, this Court should affirm summary judgment for Par.

## COUNTER-STATEMENT OF THE ISSUES

1.     Whether the district court correctly concluded that Fresenius failed to create a genuine dispute of material fact on the issue of causation, where Fresenius relied solely on speculative assertions that it would have evaded Par's patents in hypothetical litigation over a hypothetical product that Fresenius never actually developed.

2.     Whether Fresenius failed to create a genuine dispute of material fact on the issue of antitrust injury where the undisputed facts reveal that Fresenius's only asserted injury stems from its decision not to compete for a contract with its preferred API supplier.

3.     Whether Fresenius failed to create a genuine dispute of material fact that Par substantially foreclosed competition for vasopressin

injection where Fresenius offered no evidence that Par controlled a significant percentage of the API market and the undisputed facts establish that vasopressin API was widely available.

4.    Whether Fresenius failed to create a genuine dispute of material fact that Par committed tortious interference where Fresenius concedes that an inability to prove causation is fatal to this tort claim and Fresenius failed to address any of the claim's additional elements.

## RELATED CASES

This case has not been before this Court. Par is not aware of any related case or proceeding, other than pending patent litigation involving Fresenius's actual vasopressin injection ANDA. *Par Pharm., Inc. v. Fresenius Kabi USA, LLC*, No. 1:19-cv-01985-CFC (D. Del.).

## STATEMENT OF THE CASE

Par was the first company to seek FDA review of vasopressin injection, a life-saving product that increases blood pressure in adults experiencing vasodilatory shock. Par's Vasostrict® is the only vasopressin injection product the FDA has approved as safe and effective. As a reward for Par's diligence, the agency granted Par market exclusivity—conditioned on its ability to supply the entire U.S. market.

Fresenius's performance, in contrast, has been decidedly lackluster. Years ago, Fresenius sold unapproved vasopressin injection— ██████ ███████████████ Fresenius says it intended to reenter the market, but due to strategic missteps and a distaste for the rigors of competition, it fell behind its rivals. *Seven* other companies acquired API and developed vasopressin injection products, and *five* of them filed for FDA approval, ████████████████████████████

Rather than competing, Fresenius brought this antitrust suit. The district court rightly granted summary judgment for Par.

# I.   LEGAL AND FACTUAL BACKGROUND.

## A.   The FDA Approval Process.

Under the Food, Drug, and Cosmetic Act (FDCA), the FDA reviews all proposed drugs for safety and efficacy. 10JA2885. The first applicant must submit a New Drug Application (NDA). 10JA2873. A firm looking to sell a generic version of an existing product may submit an Abbreviated New Drug Application (ANDA). 21 U.S.C. § 355(j).

Each application must provide chemistry, manufacturing, and controls (CMC) information for every ingredient, including the API. 21 C.F.R. §§ 314.50(d)(1), 314.94(a)(9). The applicant may include CMC information for the API in the NDA or ANDA, or it may reference an API

supplier's Drug Master File (DMF)—a confidential submission providing detailed information on the manufacture, packaging, and storage of the API in question—if the applicant has a Letter of Authorization (LOA) from the supplier. 5JA1257-58; 10JA2876-77.

### B. The FDA Encouraged Companies to Seek Approval For Vasopressin Injection.

Because vasopressin injection was first sold before the FDCA's enactment, it was not initially subject to FDA review. 10JA2885, 2889. The FDA historically permitted pharmaceutical manufacturers to sell vasopressin injection and other so-called "grandfathered" products without formal approval. 10JA2889; D.E. 174-03, at 11-12.

In 2006, the FDA launched an initiative to encourage pharmaceutical manufacturers to seek approval for "grandfathered" products like vasopressin injection. 10JA2885. To incentivize companies to submit to agency review, the FDA adopted a policy of removing unapproved products from the market once the first NDA for a "grandfathered" product is approved, thus giving the NDA holder a "period of de facto market exclusivity." D.E. 174-03, at 7-8.

## C. Fresenius Lost the "Foot Race" to Obtain FDA Approval For Vasopressin Injection.



5JA962-63, 973.

5JA1128-29; 5JA1213-14; 5JA1220-21; 6JA1446-47.

D.E. 201-05.

6JA1695.

5JA1022-23.

and Par launched the product as Vasostrict® in November 2014. 19JA5793; D.E. 167-08; D.E. 167-10. Shortly thereafter, the FDA applied its "grandfathered" drugs policy

7JA1700-01.

As Fresenius's Director of Portfolio Management testified,

5JA1220.

### D.    Par Committed to Supply the Entire U.S. Market.

As the only company with FDA approval to sell vasopressin injection, Par had to demonstrate that it could supply the entire U.S. market. D.E. 167-35, at 12-18; D.E. 168-04; D.E. 168-05; D.E. 168-06. ███

███████████████████████████████████

███████████████████████████████ D.E. 168-05;

D.E. 168-04. █████████████████████████████

███████████████████████████████████

███████████████████████████████ D.E. 168-06; D.E.

168-07; D.E. 168-08; D.E. 189-33 (Slide 21).

███████████████████████████████████

████████ 5JA1022; 10JA2685. ████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████ D.E. 167-06, 160:10-21, 163:7-24; D.E. 168-10,

122:24-123:5, 145:9-17; D.E. 168-13 (Slide 7); D.E. 189-33 (Slide 21).

### 1.    ████████████████████████

███████████████████████████████████

███████████ 11JA3301-25. ████████████████



████ *See* App.Br. 9-10. ████

████ *Id.*
(citing 11JA3262). ████

████ 11JA3275-76. ████

████ *Id.* ████
████ 11JA3301-25.[1]

████

████ *E.g.*, 5JA1122; 6JA1598-99; 19JA5805-5809;
19JA5712; 19JA5893-94. ████

████

████ 8JA2305.

████

████

---

[1] ████ App.Br. 6. ████ 12JA3341 (emphasis added). There is
nothing wrong with opposing unsafe medications.

5JA1124-25. Fresenius's President of Pharmaceuticals testified that



▮▮▮▮▮▮▮▮▮▮▮▮ ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

**2.** ▮▮▮▮▮▮▮▮▮▮▮▮

Fresenius alleges that Par had exclusive agreements with two other API suppliers: Bachem and PolyPeptide. App.Br. 8. That is wrong, though it is immaterial for purposes of this appeal.[2] ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ D.E. 151-37; D.E. 152-02. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ D.E. 188-36, 461:8-462:7.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ 19JA5837; D.E. 190-17.

---

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

█████████████████████████████████████████████████████████████

███████████████████████████████.[3] Nobody would blame the

operator of a fleet of delivery trucks for buying spare tires, even if the

drivers never use them.

### E.    Enticed By Vasostrict, Fresenius Pursued an ANDA.

Fresenius criticizes Vasostrict's prices, but omits an important de-

tail: █████████████████████████████████████████████████

████████████ D.E. 169-18, at -189; 6JA1664. ███████████████

█████████████████████████████████████ ████ █████████████

███████████████████████████████████████████████████████

████████████ 6JA1664; D.E. 188-16, 176:14-177:21. Still, Fresenius did

not move quickly. █████████████████████████████████████████

██████████████████████████████████████████ 11JA3065.

### F.    Fresenius Did Not Compete For BCN's API Supply.

Fresenius says it intended to file an ANDA by July 2016 in reliance

on BCN's DMF. App.Br. 7. █████████████████████████████████

---

[3] ████████████████████████████████████████████████████████
██████████████████████████████ █ █ ███████████████████████
████████████████████████████████████████

*Id.*

7JA1814.

7JA1810.

7JA1890.

6JA1351-52, 1369, 1372, 1375, 1380-81, 1388-91, 1430.

6JA1352, 1377-78, 1380.

6JA1345-47, 1394, 1410, 1415-18.

7JA1834.

████████████████████████████████ 11JA3214-15; 7JA1916. ████

████████████████████████████████████████ 5JA1146-

47; *see* D.E. 179, at 112, 118, 121, 123-24 (████████████████).

████████████████████████████████████████████

████ App.Br. 10, ████████ ██ ████████████ D.E. 179, at 118,

123-24. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ ██████ ██████

11JA3283-84; D.E. 179, at 117-18. Fresenius's head of generics, Marc-

Alexander Mahl, testified that ██████████████████████████

████████████████████████████ 5JA1009. ████████████

████████████████████ 5JA1009-10. ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

7JA1823, 1826; 19JA5887-88.

████████████████████████████████████████

████████████████████████████████████████████

████████████ 7JA1916. ██████████████████████████

████████████████████████████████████████ 20JA6022-

24. █████████████████████████████████████████

7JA1916. Indeed Fresenius did not. █████████████████████

████████████████████████████████████████████

███████ 7JA1920.

███████████████████████████ 11JA3301-25.

### G.    Fresenius Did Not Diligently Pursue API Sources.

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ 7JA1922. This made good

sense. Because the FDA does not require a DMF until a pharmaceutical

manufacturer actually files its ANDA or NDA, pharmaceutical manufac-

turers can (and often do) partner with API suppliers that do not yet have

DMFs. 5JA1255, 1264-65; 6JA1476; 19JA5682-83; 20JA5970-71. But

Fresenius dragged its feet. ████████████ ███ ████████████

████████ 7JA1929; 7JA1940-41; 7JA1948-49; 7JA1959.

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ 7JA1925-29;  7JA1939-40;

7JA1948; 7JA1957-58; 7JA1967-68; 7JA1982. 

7JA1927; 7JA1938; 8JA2018; 8JA2020.

8JA2069-75.

. 6JA1619-22; 8JA2069-75; D.E. 167-12, 163:4-167:18.

D.E. 171-15.

D.E. 171-25; D.E. 171-31.

8JA2080; 8JA2088; 5JA1332-33.

8JA2047; D.E. 171-38; D.E. 172-02, at -221.

## H.   Seven Other Companies Developed Vasopressin Injection.

Five companies _____ in filing ANDAs or NDAs for vasopressin injection: Eagle, Sandoz, Amphastar, Amneal, and American Regent. 8JA2089-134; 8JA2306-13; 9JA2314-47. All faced the same market conditions as Fresenius—including Par's supposed exclu-

sive agreements—yet they acquired vasopressin API, developed vaso-pressin injection products, and sought FDA approval. *Id.* Additionally, QuVa and Athenex introduced compounded vasopressin injections—meaning they, too, procured API. 2JA119-21; 10JA2782; 19JA5646-47.

## I.    Par Patented Its Novel Vasostrict Formulations.

Following Vasostrict's approval, Par continued to innovate.



.[4] 6JA1582-83.

6JA1579-80, 1585-86; 10JA2892.

Par obtained patents covering its novel Vasostrict formulations and listed them in the *Orange Book*. 2JA124-3JA442; 14JA3980. Par has sued six ANDA/NDA filers, including Fresenius, for infringement.

---

[4] The RLD is the "drug identified by FDA as the drug product upon which an applicant relies in seeking approval of its ANDA." 21 C.F.R. § 314.3(b).

**J.** 

App.Br. 14.

*Id.* at 47.

8JA2047, 2050; 14JA4112-13; D.E. 173-05, at -138.

## II.    PROCEDURAL HISTORY AND DECISION BELOW.

Fresenius commenced this case in July 2016, asserting ten federal and state-law antitrust claims and one tortious interference claim. In July 2019, the parties cross-moved for summary judgment. On February 25, 2020, the district court granted Par's motion on the ground that Fresenius did not produce "concrete" evidence of causation, an essential element of its claims. Op. 6-12. The court explained that "a patent may 'break the chain of causation' if it independently 'would have prevented market entry.'" *Id.* at 6 (quoting *Wellbutrin*, 868 F.3d at 165). And there was no genuine dispute that Par's patents would have lawfully prevented Fresenius from selling vasopressin injection. *Id.* at 12.

Fresenius sought to avoid this problem by arguing that, but for Par's alleged exclusive agreements, Fresenius would have filed an ANDA for a hypothetical product in mid-2016, prevailed in hypothetical patent infringement litigation, gained FDA approval for its hypothetical product, and launched in 2018. *Id.* at 6. The court found this theory "unduly speculative" for two principal reasons. *Id.* at 7.

*First*, Fresenius provided "no concrete basis" for "evaluating what would have happened in a purely hypothetical, complex patent proceeding." *Id.* There was no patent challenge; Fresenius never initiated IPR. *Id.* at 7-8. Fresenius relied wholly on its experts' speculation about what might have happened if it had challenged Par's patents—but as the court recognized, their predictions were manufactured "out of whole cloth." *Id.* at 8 (quoting *In re Androgel Antitrust Litig.*, 2018 WL 2984873, at *14 (N.D. Ga. 2018)). This speculation did not create a genuine issue.

*Second*, Fresenius did not produce an ANDA describing its supposed vasopressin injection product—not even a "draft ANDA" or the "elements" of one. *Id.* at 9-10. At the same time, Fresenius told the court to ignore its *actual* ANDA, likely because it indisputably infringes Par's patents. *Id.* at 10 n.10. Since an ANDA is essential to evaluating patent

infringement, Fresenius's failure to produce anything resembling an ANDA rendered its predictions "even more speculative." *Id.* at 7-10.

The district court also held that Par was not to blame for Fresenius's failure to file an ANDA in 2016. Noting that Fresenius never submitted a "competitive offer" for API supply—not even when BCN invited one—the court ruled that Fresenius's "unwillingness to bid … undermines its stance that Par prevented Fresenius'[s]" ANDA filing. *Id.* at 8.

Because Fresenius's unsupported and "unduly speculative" theories were insufficient to create a genuine dispute, the district court entered summary judgment for Par. *Id.* at 12.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Tundo v. Cty. of Passaic*, 923 F.3d 283, 286 (3d Cir. 2019). The Court may affirm on a different ground from the district court. *Resolution Tr. Corp. v. Fidelity & Deposit Co. of Md.*, 205 F.3d 615, 635 (3d Cir. 2000). At this stage, a plaintiff may not rely on "bare assertions, conclusory allegations[,] or suspicions." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418,

436-37 (3d Cir. 2007) (quotation omitted). It "must point to specific factual evidence showing that there is a genuine dispute on a material issue." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 218 (3d Cir. 2015).

## SUMMARY OF THE ARGUMENT

**I.A.**  Fresenius's antitrust claims fail as a matter of law because Par's patents defeat the essential element of causation. Fresenius argues that summary judgment should be reversed because its experts assert that Fresenius would have pursued a hypothetical product (different from the *actual* product it developed) and won a hypothetical patent infringement case against Par. The district court correctly held that this testimony was too speculative to defeat summary judgment.

**B.**  Fresenius's main argument is that the district court failed to apply *Wellbutrin*, which Fresenius construes as requiring courts to deny summary judgment whenever a plaintiff presents expert testimony predicting that it would prevail in a hypothetical patent suit. Fresenius misreads *Wellbutrin*, which does not reject—and, in fact, confirms—the ordinary rule that speculation cannot defeat summary judgment. Supreme

Court and Third Circuit precedent establishes that courts must be especially rigorous at summary judgment when a plaintiff's claim turns on the outcome of hypothetical litigation.

**C.    Fresenius's theory of causation is too speculative to defeat summary judgment.**

**1.**    Fresenius contends that a hypothetical court would have found that its hypothetical product did not infringe Par's patents. That argument depends on convincing a jury, without evidence, that Fresenius would have sought FDA approval for a vasopressin injection product ██ ███████████ from Fresenius's real-world product. If that were not speculative enough, Fresenius's formulation expert's infringement analysis is riddled with holes and legal errors.

**2.**    There is likewise no basis for Fresenius's assertion that it would have overcome the presumption of patent validity and convinced a court or the Patent Trial and Appeal Board (PTAB) that Par's patents are invalid for obviousness. Fresenius could have raised these arguments in IPR, but it never did—which itself defeats causation. Fresenius's invalidity arguments are also speculative and demonstrably incorrect, as again illustrated by its expert's disqualifying legal errors.

**3.**    Fresenius's argument that it would have prevailed in patent litigation is speculative and cannot defeat summary judgment, as this Court's precedent makes clear.

**II.**    Summary judgment as to the antitrust claims was independently warranted because Fresenius did not suffer antitrust injury.

**A.**    Fresenius's claimed "injury" derives entirely from losing access to BCN. ████████████████████████████████████████ ██████████████████████████ That is not a cognizable injury.

**B.**    Fresenius's stated reasons for not competing for a BCN contract are legally irrelevant.

**C.**    Fresenius is also wrong that the district court weighed evidence in observing that Fresenius was unwilling to bid for a BCN contract. That evidence is undisputed.

**III.**    There is a third reason why summary judgment was warranted as to Fresenius's antitrust claims: no reasonable jury could conclude that Par's alleged exclusive deals substantially foreclosed competition for vasopressin injection.

**A.**    Fresenius does not present any evidence that Par controlled a significant percentage of the API supply. ████████████████████

████████████████████████████████████████████ which are

necessary steps to making that showing.

**B.**    The undisputed evidence confirms that vasopressin API was

widely available and that competitors had ready access to it—as demon-

strated by the fact that at least *seven* of them procured API and developed

vasopressin injection products.

**IV.**    Since Fresenius did not independently address its tortious in-

terference claim in its opening brief, it has waived the issue on appeal.

Fresenius in any event failed to create a genuine dispute on the issue of

tortious interference.

## ARGUMENT

## I.    PAR DID NOT CAUSE FRESENIUS'S CLAIMED INJURY.

Fresenius's allegation that Par unlawfully prevented it from enter-

ing the market fails as a matter of law. Par's patents preclude Fresenius's

entry, *regardless* of any alleged exclusive dealing. Fresenius's argument

that it would have avoided those patents through a hypothetical patent

challenge it never filed—based on a hypothetical product it never devel-

oped—is pure speculation, as the district court correctly concluded.

**A.    The District Court Correctly Held That Par's Patents Defeat Causation As a Matter of Law.**

The crux of Fresenius's case is that Par's alleged exclusive agreements blocked Fresenius from entering the vasopressin injection market. Fresenius must prove that the alleged antitrust violation was the but-for and proximate cause of its injury. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). If another factor would have kept Fresenius off the market, that negates causation and precludes liability. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265-69 (3d Cir. 1998).

To "proceed to trial," Fresenius has to present "a theory of causation that is both plausible and cognizable by the antitrust laws," *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 486-87 (3d Cir. 1992), and grounded in "evidence," *Wellbutrin*, 868 F.3d at 167. Proving causation typically entails the construction of a "but-for world": a "reasonable offense-free world" that describes what "would have happened 'but for' the defendant's unlawful activities." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012). This is not an invitation to concoct an idealized alternative reality; plaintiffs "cannot foist their version of what might have been on the court under the rubric of antitrust injury." *City of Pittsburgh*, 147 F.3d at 267.

Fresenius claims it would have entered the market as early as mid-2018 in the "but-for world." App.Br. 14; D.E. 180, at 18. The problem is that Par's patents would have "effectively blocked" Fresenius's entry. *Wellbutrin*, 868 F.3d at 165. So Fresenius cooked up a theory that, if not for Par's alleged conduct, it would have formulated a different product, challenged Par's patents (despite never doing so in the real world), and won an across-the-board-victory in hypothetical litigation. Specifically, Fresenius said it would prove that:

1.    Fresenius would have developed a hypothetical vasopressin injection product ███████████ from the product it developed in real life. Op. 10 n.10; App.Br. 47.

2.    Fresenius would have filed an ANDA for this hypothesized product in summer 2016. Op. 6; 6JA1552-53.

3.    Fresenius would have invalidated Par's patents or defeated any claim that its hypothetical product infringed those patents, and the Federal Circuit would have affirmed. Op. 6-7; 6JA1554; 14JA3996, 4011-14; D.E. 164, at 22.

4.    The FDA would have approved Fresenius's hypothetical ANDA, allowing Fresenius to launch. Op. 6-7; 6JA1553.

This Court's precedent requires Fresenius to "set forth specific facts"—not "allegations, speculations, [or] unsupported assertions"—"showing a genuine issue for trial." Op. 4 (citing *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001)). Applying that rule, the district court held

that Fresenius's "unduly speculative" theories did not raise a genuine is-

sue. *Id.* at 5-12. As the district court explained, any jury finding that

Fresenius would have avoided Par's patents—for example, "that Frese-

nius would have used [its hypothetical] formulation for [its] ANDA," and

that, on the basis of that "Hypothetical Product," Fresenius would have

won a "hypothetical infringement suit[]"—would have to be "cut ... from

'whole cloth.'" *Id.* at 9-10. This "highly speculative chain of events" does

not present a triable issue. *Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210,

223 (3d Cir. 2002). The district court's decision should be affirmed.

## B.    Fresenius's Contrary Contention Is Based Entirely On a Misreading of This Court's Precedent.

Fresenius's principal argument is that the district court "fail[ed] to

follow *Wellbutrin*." App.Br. 19-20. Fresenius construes *Wellbutrin* as es-

tablishing a "framework for assessing causation in antitrust claims in-

volving patents," under which plaintiffs must submit—*and courts must

accept*—experts' predictions about the outcome of hypothetical litigation.

*Id.* at 2-3, 25-26, 42. Fresenius's reading of *Wellbutrin*, and of this Court's

precedent generally, is wrong.

Far from announcing some special rule for "antitrust claims involv-

ing patents," *id.* at 2, *Wellbutrin* reaffirmed and applied the longstanding

rule that plaintiffs must present concrete, nonspeculative evidence to survive summary judgment. In *Wellbutrin*, this Court rejected the plaintiffs' causation evidence as speculative and untethered from reality—just as the district court did with Fresenius's contentions here.

The *Wellbutrin* plaintiffs alleged that the defendants entered into "reverse-payment" settlements that delayed the launch of generic Wellbutrin. 868 F.3d at 152. Similar to Fresenius, they argued that but for the defendants' alleged anticompetitive conduct, Anchen's patent would not have prevented Andrx, a would-be generic competitor, from entering the market. *Id.* at 165-66. This Court rejected that theory as unsupported by record evidence and affirmed summary judgment. *Id.* at 166-70.

Fresenius says the *Wellbutrin* Court "faulted the plaintiffs" for not presenting expert testimony predicting "the probable outcome of the patent litigation." App.Br. 26-27. Not so. The plaintiffs *did* rely on an expert who purported to predict hypothetical litigation outcomes: a law professor and defense expert who testified that Anchen, the patentee, likely would have lost the patent case. 868 F.3d at 169. The Court did not blindly accept the testimony on which the plaintiffs relied. *Id.* The Court scrutinized the professor's predictions and, to the extent they were not

supported by record evidence, disregarded them. *Id.*[5] Nothing in *Wellbut-rin* suggests that the plaintiffs could have gotten past summary judgment if they had been the ones paying the expert.

The mere fact that a plaintiff's theory hinges on hypothetical litigation outcomes does not mean causation cannot "be resolved on summary judgment." App.Br. 25. The *Wellbutrin* Court resolved the question on summary judgment, after all. Where, as here, the evidence would not permit a reasonable jury to find in the plaintiff's favor absent speculation, summary judgment is warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Nothing in *Wellbutrin* negates the rule that speculation cannot defeat summary judgment—in fact, *Wellbutrin* applied that rule. Fresenius never mentions it, but the *Wellbutrin* Court rejected the plaintiffs' alternative but-for-world theory—which posited that Andrx and Anchen would have negotiated a hypothetical license—as "speculative" and not "rooted in reality." 868 F.3d at 166-67. Even if juries in some cases "may

---

[5] To prevail in patent litigation, Anchen, the patentee, would have had to win on infringement, validity, *and* enforceability. *Wellbutrin*, 868 F.3d at 169. The professor gave Anchen just a one-in-three shot of doing so. *Id.* The Court, however, did not accept his opinions on validity or unenforceability because they were inconsistent with record evidence. *Id.*

predict the outcome of hypothetical scenarios," the Court explained, that "says nothing about the type or amount of evidence that is needed for a plaintiff to withstand summary judgment." *Id.* at 167 n.57.

Fresenius accuses the district court of holding that "no amount of evidence would have enabled Fresenius Kabi to survive summary judgment," App.Br. 18, but in fact, the district court followed *Wellbutrin* to a tee. The court carefully evaluated Fresenius's proffered evidence and concluded that it was too speculative to create a genuine dispute. Op. 6-12. That's exactly what this Court did in *Wellbutrin*. *See* 868 F.3d at 165-70. Neither *Wellbutrin* nor any other precedent requires courts to accept speculative expert predictions and let a jury sort it out.

*Wellbutrin* underscores the established principle that courts must be wary of allowing plaintiffs to proceed to trial based on predictions of how hypothetical litigation would come out. "It is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result" in a particular case. *Whitmore v. Arkansas*, 495 U.S. 149, 159-60 (1990). Even under the relatively lenient standards for Article III

standing,[6] the Supreme Court is "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413-14 (2013). As this Court warns, "causation [is] difficult to prove" when it depends on hypothesized litigation outcomes. *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 257 (3d Cir. 2013).[7]

This Court applied that principle in *City of Pittsburgh*, on which *Wellbutrin* relied. There, the City challenged a power-company merger under the Sherman Act. 147 F.3d at 258. One company (Duquesne) had a Public Utility Commission (PUC) certificate to provide electricity to "Redevelopment Zones," but the other company (Allegheny) did not. *Id.* at 259-62. The City and Allegheny had petitioned the PUC to permit competition in the zones, but once the defendants agreed to merge, Allegheny and the City withdrew their petitions. *Id.*

---

[6] Antitrust standing is "more demanding" than constitutional standing. *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996).

[7] Fresenius's reference to malpractice law is a red herring. Even in that context, a plaintiff cannot rely on unfounded expert testimony. *E.g.*, *Davis v. Brouse McDowell, L.P.A.*, 596 F.3d 1355, 1363-64 (Fed. Cir. 2010).

This Court rejected the City's claims for lack of causation. *Id.* at 269. Allegheny never had permission to compete in the zones, and the PUC proceedings were "vigorously contested." *Id.* at 268. Since "we do not know whether the PUC would ever have granted" the petitions, the Court held, "we simply cannot know whether there is any causal connection" between the merger and the alleged loss of competition in the redevelopment zones. *Id.* at 267-68. Rejecting the City's "speculative exercise," this Court ruled—"*as a matter of law*"—that the PUC regulatory scheme "cut[] the causal chain." *Id.* (emphasis added).

Patent cases are just as "vigorously contested" as PUC proceedings, and predicting their outcomes is no less "speculative." Asking a jury to determine the outcome of hypothetical patent litigation is especially fraught, since claim construction—a precondition to assessing obviousness and infringement—must be performed by *courts. Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996). Because claim construction is a "special occupation," the Supreme Court explains, a "judge, from his training and discipline, is more likely to give a proper interpretation to such instruments than a jury." *Id.* at 388-89 (quotation omitted).

Asking juries to step into a judge's shoes and predict the outcome of hypothetical patent litigation would turn the Supreme Court's evaluation of relative institutional competency on its head.

There may, in theory, be some case in which a plaintiff is able to submit sufficient evidence for a jury to make a reasoned judgment about hypothetical patent litigation. For the reasons that follow, the district court correctly concluded that this case is not one of them.

## C.    Fresenius's Speculative Theory of Causation Is Insufficient to Defeat Summary Judgment.

Fresenius's theory of causation rests on claims that it would have pursued a hypothetical product and successfully defeated Par's infringement claims or invalidated Par's patents. Fresenius does not present any actual *evidence* bearing this story out, such as an ANDA or documents from a real-life patent challenge. Fresenius instead presents experts who predict that if Fresenius had developed that hypothetical product and challenged Par's patents, it would have won. But even respected experts cannot save a plaintiff that "anchor[s] its case on theoretical speculation." *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1198-99 (3d Cir. 1995); *e.g.*, *In re TMI Litig.*, 193 F.3d 613, 717 (3d Cir. 1999), *amended*

*by* 199 F.3d 158 (3d Cir. 1999); *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275-76 (3d Cir. 1995).

Because Fresenius's expert testimony is not "supported by sufficient facts to validate it in the eyes of the law," it does not create a genuine dispute. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). This Court should affirm the judgment below.

### 1.    *Fresenius's Non-Infringement Arguments Are Speculative.*

Fresenius claims it has "presented the same evidence it would have presented in patent litigation." App.Br. 3. That is not true. In a Hatch-Waxman case, the infringement analysis is "grounded in the ANDA application and the extensive materials typically submitted in its support." *Glaxo, Inc. v. Novapharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997). Here, there is no ANDA describing the hypothetical product Fresenius says it would have brought to market. Without that foundation, any expert opinions on non-infringement are speculative and incomplete.

### a.    Fresenius's Hypothetical Product Is Speculative.

There is no way to tell whether a product infringes a patent unless you know what that product is. *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, 1350 (Fed. Cir. 2006). In a Hatch-Waxman

case, the ANDA supplies that information. ██████████████████ ████

████████████████████████████████████████████████████████████

████████████ App.Br. 8. Its Rule 30(b)(6) witness likewise testified that,

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ 20JA6010.

████████████████████████████████████████ Without it, a jury could

only guess what Fresenius's product might have been.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ This entailed risk: the FDA

ordinarily does not accept (much less approve) an ANDA unless the pro-

posed drug matches the current RLD. 10JA2687-90; 5JA1294-96. ████

████████████████████████████████████████████████

██████████████████████████████████ 12JA3465; 5JA1308-09.

██████████████████████████████████████████████████████

████████████████████████████████████████ 8JA2047;

14JA4112-13; D.E. 173-05, at -138. But that won't help Fresenius win the

hypothetical patent litigation it concocted for this case, ████████████



*See* App.Br. 47-48. To get around that problem, Fresenius insists that in an alternative universe, ▮▮▮▮▮▮▮▮▮▮ *Id.*

What evidence does Fresenius present? ▮▮▮▮▮▮▮ *Id.* at 51. ▮▮▮▮▮▮▮▮▮▮

18JA5231-32. "Such post hoc declarations are inevitably suspect." *Tse*, 297 F.3d at 222. They are especially suspect here, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ *See id.* at 221-23 (affirming summary judgment where real-world evidence belied declarations predicting plaintiffs' conduct in but-for world). Assuming it is admissible,[8] Mahl's "conclusory, self-serving affidavit[]" cannot defeat summary judgment. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002). A declarant must "set forth facts, rather than opinions or conclusions." *Id.* With the benefit of hindsight, ▮▮▮▮▮▮▮

---

[8] *Cf. United States v. Fulton*, 837 F.3d 281, 291 (3d Cir. 2016) (Federal Rule of Evidence 701 excludes lay opinion testimony that "merely tells the jury what result to reach") (quotation omitted).

but "'beliefs' … cannot be used to resist a summary judgment motion." *Williams v. Borough of W. Chester*, 891 F.2d 458, 470 (3d Cir. 1989).

Nor does Mahl's assertion make any sense. █████████████ ████████████████████████████████████████████████ ████████████████████████████████████ 18JA5227-28, 5232. But first-filer exclusivity is available *only* where the ANDA filer makes a "Paragraph IV" certification as to *Orange Book*-listed patents. 21 U.S.C. § 355(j)(5)(B)(iv)(I). ████████████████████████ *Par did not have any Vasostrict patents.* 14JA3980. Fresenius could not have been motivated to pursue regulatory exclusivity that was not available.

Making matters worse, Mahl's prediction runs headlong into reality. ████████ ███ ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████ █████████ █ 8JA2047; 14JA4112-13. Mahl's "pure supposition" that Fresenius would have acted otherwise does not cut it. *Jackson v. Danberg*, 594 F.3d 210, 226-27 (3d Cir. 2010).

████████████████████████████████████████████████ ████████████████████████████████ App.Br. 47. ██████████



8JA2194.

8JA2210-14. "Counsel's factual assertions … are not evidence." *Jupiter v. Ashcroft*, 396 F.3d 487, 491 (1st Cir. 2005).[9]

### b.  Tarantino's Non-Infringement Opinions Are Speculative and Legally Deficient.

Without Fresenius's product specifications, a jury could never evaluate infringement. Tarantino's patent opinions reflect this evidentiary shortfall: he does not conduct the required "element-by-element comparison" of patent claims to an accused product. 14JA4104-05; *see Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009) (en banc). His non-infringement analysis is facially deficient. *See Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005).

---

[9] Mahl does not corroborate that the records reflect "registration batches." 18JA5229-30. Mahl nonetheless insists that the records "describe the formulation and pH" of Fresenius's hypothetical product, but he cites *no* supporting evidence. *Id.*

Tarantino and Fresenius paper over this omission, arguing that, in a patent case, it would be Par's burden to prove infringement. 8JA2168-74, 2198-99; App.Br. 46. But this is an *antitrust* case, and it is Fresenius's burden to prove causation. *Wellbutrin*, 868 F.3d at 166. The argument is especially nonsensical in the context of *this* antitrust case. Par cannot "point out [] just where, how, and why a product … infringes a claim of [its] patent[s]"[10] unless it *knows what the product is.*

There is another problem.  *See* App.Br. 50. That is not true,[11] but even by that metric, there is a gaping hole:

13JA3838-39; 14JA4000; 3JA441-42; *see* App.Br. 47.

13JA3838. But if a product's "proposed label instructs users to

---

[10] App.Br. 46 (quoting *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 200 (2014)).

[11] Par's patents claim more than just pH. 14JA4033-42.

perform the patented method," that is sufficient to establish *induced* infringement. *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010); *see* 35 U.S.C. § 271(b). ████████████████████████

████████████████████████████████████████████████████

14JA4115-17, 4119-21. This undisputed fact precludes any argument that Fresenius would not be found liable for patent infringement. *See EKR Therapeutics, Inc. v. Sun Pharm. Indus., Ltd.*, 633 F.Supp.2d 187, 202-03 (D.N.J. 2009) (summary judgment for patentee where ANDA filer's label directed doctors to infringe). Even in Fresenius's idealized but-for world, its product would infringe Par's '239 patent.

## 2. *Fresenius's Invalidity Arguments Are Speculative.*

Fresenius further contends that, but for Par's conduct, it would have invalidated Par's patents in IPR or court. App.Br. 33; 14JA3996. If Par's patents were so obviously invalid, it is strange that Fresenius never petitioned for IPR. In truth, that failure is hardly surprising. Fresenius does not present any real evidence that it would have prevailed in a validity challenge. It instead relies on legally infirm testimony about the outcome of a hypothetical validity challenge. That is not sufficient to overcome the presumption of patent validity. 35 U.S.C. § 282.

a.    <u>Fresenius's Failure to Pursue IPR Defeats Causation.</u>

If Fresenius believed Par's patents were invalid for obviousness, it could have challenged them in IPR. 35 U.S.C. § 311(b). Had it done so, PTAB would already have ruled—and Fresenius would not be asking this Court to evaluate how a hypothetical patent challenge would turn out. 14JA4011; Op. 9 n.9. Fresenius's conscious choice to avoid this efficient mechanism defeats its validity-based causation argument.

It is true that IPR is "*optional*" and not "*mandatory*." App.Br. 18-21, 46. Here, though, Fresenius argues that Par's patents would not have barred its market entry because the patents are invalid. The reason those patents stand—and the reason they would block Fresenius's entry, regardless of Par's alleged conduct—is because Fresenius never invalidated them. That breaks the chain of causation.

This conclusion follows from Third Circuit precedent. In *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223 (3d Cir. 2013), this Court held that "legal barriers particular to the pharmaceutical market, *barriers that Ethypharm chose not to surmount*," deprived Ethypharm of antitrust standing. *Id.* at 236 (emphasis added). The barrier there—"qualifying to compete in the United States"—was optional, but

Ethypharm's failure to overcome it still sank its antitrust claims. *Id.* And in *City of Pittsburgh*, this Court held that the City "interfere[d] with the chain of causation" where it alleged a loss of potential competition in "Redevelopment Zones," but had withdrawn a petition that could have opened those zones to competition. 147 F.3d at 266-68. As in those cases, Fresenius's failure to attempt to overcome a legal hurdle defeats causation as a matter of law.[12]

> b.  Tarantino's Invalidity Opinions Are Speculative and Legally Erroneous.

Fresenius's refusal to pursue IPR may seem odd in light of Professor Thomas's prediction that Fresenius had a *90-percent* chance of invalidating Par's patents. That decision becomes more understandable when one considers Tarantino's opinions. Tarantino commits a disqualifying error at *step one*, tainting his entire analysis. A jury cannot find for Fresenius on the basis of legally erroneous opinions. *See Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 197 n.9 (3d Cir. 2016).

---

[12] Fresenius quibbles that it could not argue invalidity for lack of written description in IPR, but it only raises written-description arguments for a subset of patent claims. 13JA3821-33. Fresenius could have argued obviousness—which, it says, invalidates *all* of Par's patents—in IPR. 35 U.S.C. § 311(b).

To prove obviousness, Fresenius would have to show that at the time of the invention, a person of ordinary skill in the art (POSA) would have been motivated to combine the teachings of prior art to arrive at the invention with a reasonable expectation of success. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012). The idea is to *start with* the prior art, and show that it would have led a POSA to the invention. *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881-82 (Fed. Cir. 1998). Working in the opposite direction by "[d]efining the problem in terms of its solution"—that is, as disclosed in the patent itself—is not permitted, as it "reveals improper hindsight in the selection of prior art relevant to obviousness." *Id.* at 881.

Tarantino commits that exact error: in his words, he "cited the statements in Par's Orange Book Patents themselves expressing the problems the inventors were attempting to overcome." 16JA4514; *see* 13JA3642-43. "Defining the problem in terms of its solution," as Tarantino does, "infect[s]" the entire analysis. *Monarch Knitting*, 139 F.3d at 881-82; *see Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325

(Fed. Cir. 2000) ("[The obviousness] inquiry, as a matter of law, is independent of the motivations that led the inventors to the claimed invention."). If a court or PTAB adopted Tarantino's opinion, it would be reversible error. *See Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377-80 (Fed. Cir. 2012) (vacating obviousness ruling where district court "used the invention to define the problem that the invention solves"). That cannot support a jury verdict.

It gets worse. Tarantino acknowledges that claim construction "is relevant to invalidity analyses." 16JA4507. He opines that, whether in IPR or in court, the term "vasopressin," as used in Par's patents, would *not* be construed to mean synthetic vasopressin. 16JA4508-12. This is fundamental to Fresenius's invalidity theory: if Par's patents claim *synthetic* vasopressin, a POSA would have no reason to consider prior art references involving *naturally-derived* vasopressin—such as the "Lithuanian Patent"—much less to combine them with other prior art to achieve Par's patented invention. 14JA4067-73, 4083-84; *see* App.Br. 34-38.

Lo and behold, the courts overseeing the ANDA cases have construed "vasopressin" in Par's patents to mean *synthetic* vasopressin. Order 2, *Par Pharm., Inc. v. Amphastar Pharm. Inc., et al.*, No. 1:18-cv-

2032-CFC-CJB (D. Del. May 11, 2020), Dkt. 105; *Par Pharm., Inc. v. Sandoz, Inc.*, 2020 WL 1130387, at *7 (D.N.J. 2020).[13] That renders the Lithuanian Patent—"the proverbial 'smoking gun' of Fresenius Kabi's obviousness case," App.Br. 34—irrelevant. *See Honeywell Int'l, Inc. v. United States*, 609 F.3d 1292, 1297-1301 (Fed. Cir. 2010) (under correct claim construction, invention was not obvious).

Tarantino's invalidity opinions are laden with hindsight bias and speculation. They do not create a genuine dispute.[14]

### 3. *Fresenius's Hypothetical Litigation Predictions Are Speculative.*

Even setting aside these technical patent-law issues, Fresenius would still have a problem. Fresenius is not asking jurors to invalidate Par's patents or render a verdict of non-infringement. Rather, it expects

---

[13] Specifically, the courts construed "vasopressin" to mean "synthetic arginine vasopressin," as defined in the patents in SEQ ID No. 1.

[14] Fresenius's arguments about secondary considerations overlook that secondary considerations are not required. App.Br. 38-39; *see Novartis Pharm. Corp. v. West-Ward Pharm. Int'l Ltd.*, 287 F.Supp.3d 505, 510 (D. Del. 2017), *aff'd*, 923 F.3d 1051 (Fed. Cir. 2019).

them to do something that is "just not possible"[15]: predict how *hypothetical* judges would decide a *hypothetical* case over a *hypothetical* product.

This Court rejected an equally speculative theory in *City of Pittsburgh*. As noted, the City's antitrust claims depended on the proposition that, but for the merger, the PUC would have allowed Allegheny to compete in redevelopment zones. 147 F.3d at 265-68. Just as Allegheny could not compete without PUC authorization, Fresenius cannot compete without a favorable patent ruling. Infringement litigation is no less "vigorously contested" than PUC proceedings, and we "do not know" how a hypothetical case would turn out. *Id.* at 267-68. Like the City, Fresenius "is really claiming that it would have benefited from competition it *hoped would occur*." *Id.* at 267. As this Court held, that does not suffice. *Id.*

To be sure, Fresenius's patent-law expert, Professor Thomas, agrees with Fresenius's rosy predictions. App.Br. 42. But how did Thomas reach his conclusions? ██████████████████████████ ██████████████ 15JA4453. ██████████████████████ ████████████████████████████████████████

---

[15] *Whitmore*, 495 U.S. at 159-60.

██ ██ ████████████████████████—and conjured up prob-

abilities out of thin air. 8JA2228-39, 2244-46. An expert's *ipse dixit* does

not create a genuine dispute, which is why this Court consistently affirms

summary judgment in the face of speculative or unsupported expert tes-

timony.[16] *See Brooke Group*, 509 U.S. at 242 (expert testimony may "in-

terpret[]" record evidence, but "is not a substitute for [it]").

This brings us back to Fresenius's argument that it "followed *Well-*

*butrin*'s blueprint." App.Br. 32. That is true—as in *Wellbutrin*, Frese-

nius's speculative predictions about hypothetical patent proceedings can-

not defeat summary judgment. If anything, Fresenius's predictions are

*less* "rooted in reality" than those in *Wellbutrin*. 868 F.3d at 167. *Well-*

*butrin* involved an *actual* ANDA and *actual* patent challenges. Op. 11-12;

*see* 868 F.3d at 145-46. If those plaintiffs could not get to a jury, Fresenius

does not come close. Fresenius *does not cite a single case* in which an an-

---

[16] *E.g.*, *Valspar*, 873 F.3d at 197; *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 434-35 (3d Cir. 2016); *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 406 (3d Cir. 2016); *Advo*, 51 F.3d at 1198-99.

titrust plaintiff defeated summary judgment in reliance on *post hoc* testimony predicting alternative business decisions, product formulations, legal strategies, and litigation successes in a but-for world.[17]

This Court has long held that a "jury may not be allowed to guess." *Nash v. Raun*, 149 F.2d 885, 888 (3d Cir. 1945). That is what Fresenius wants a jury to do—many times over. The district court correctly granted Par summary judgment. This Court should affirm.

## II. FRESENIUS HAS NOT SUFFERED ANTITRUST INJURY.

The Clayton Act requires proof of "antitrust injury"—"loss stem[ming] from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 344

---

[17] Fresenius's reliance on out-of-Circuit reverse-payment cases is unavailing. Those district court decisions involve *actual* ANDAs and patent litigations, and do not apply Third Circuit law. Op. 11; *see In re Loestrin 24 Fe Antitrust Litig.*, 433 F.Supp.3d 274, 326 (D.R.I. 2019) (holding that plaintiff need only "submit 'some evidence' that the generic <u>could</u> have won the patent suit," not that it "would have"); *United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA*, 296 F.Supp.3d 1142, 1150 (N.D. Cal. 2017) (same); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 563144, at \*14 (D. Mass. 2018) (same).

Even if *some* experts may have a foundation to predict litigation outcomes in other circumstances, that does not mean Fresenius's experts do here. *Cf.* Hr'g Tr. 73:18-23, *In re Nexium (Esomeprazole) Antitrust Litig.*, No. 1:12-md-02409-WGY (D. Mass. Jan. 24, 2014), Dkt. 833 (excluding Thomas); *Solodyn*, 2018 WL 563144, at \*16 (excluding Thomas in part).

(1990). A plaintiff cannot recover for injuries flowing from competition itself. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109-10 (1986).

That bars Fresenius's claims, independent of whether Fresenius offered sufficient evidence of causation. Fresenius's alleged "injury" derives wholly from its loss of access to BCN, its preferred API supplier. App.Br. 14; D.E. 180, at 39.[18] The undisputed facts show that Fresenius had every opportunity to compete for BCN's supply. It just chose not to. Op. 8. This provides an additional basis for affirming the judgment below.

## A.    Fresenius Had Every Opportunity to Compete.



7JA1814.

6JA1351-52, 1369, 1372, 1375, 1380-81, 1388-91, 1430.

5JA1009-10 5JA1146-47; 7JA1916; D.E. 179, at 112,

---

18 9JA2417-21; 7JA1789-90.

118, 121, 123-24. The antitrust laws guarantee the opportunity to compete, but not the right to succeed. *Cargill*, 479 U.S. at 116.

This Court's decision in *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010), is controlling. The plaintiff there, STA, alleged that a dominant competitor, Hoosier, had long-term exclusive contracts with motorsports sanctioning bodies. *Id.* at 63, 78. STA accused Hoosier of buying off sanctioning bodies with large sums of cash. *Id.* at 66, 78-79. One body, for instance, "rejected STA's various inquiries" and rebuffed STA's "non-exclusivity" proposal after Hoosier "more than doubled" its exclusivity payments. *Id.* at 68. In another instance, Hoosier indemnified a sanctioning body for a judgment against it. *Id.* at 66.

Emphasizing that competition for exclusive contracts should "be *encouraged*," this Court held that STA did not suffer antitrust injury. *Id.* at 83. That Hoosier paid generous sums to sanctioning bodies did not matter; "offer[ing] more money" is not "coercive." *Id.* at 79. While the competitive process was "less than perfect," STA had "a clear opportunity to compete" for "exclusive tire contracts." *Id.* at 83-84. Its inability or unwillingness to match Hoosier's offers was not antitrust injury. *Id.*

*Race Tires* controls here. ████████████████████████████

████████████████████████████████████████████████

App.Br. 10. ████████████████████████████████

████████████████████████████████████████████████

████████ Just as STA had a "clear opportunity to compete" for "exclu-

sive tire contracts," 614 F.3d at 84, ████████████████████

████████████████████████████████████████████████

████ 7JA1916. And while STA at least submitted bids, 614 F.3d at 66-68,

████████████████████████ It has not "suffered the kind of injury that

gives rise to an antitrust claim." *Id.* at 84.

## B.   None of Fresenius's Excuses Matter.

Fresenius does not dispute the material facts. All it does is recite a

laundry list of excuses, but none of them matter.

*First,* ████████████████████████████████████

████████████████████████████████████████████████

████████ App.Br. 54-55. Even if that were true, Fresenius is describ-

ing competition: ████████████████████████████████

████████████ ████ ████████████████████████████

██████████████████████████████ D.E. 179, at 117-18. ████

████████████████████████████ 5JA1009-10, but that is what

the Sherman Act expects. *See AAA Liquors, Inc. v. Joseph E. Seagram &*

*Sons, Inc.*, 705 F.2d 1203, 1207 (10th Cir. 1982). ███████████████

████ █████████████████████████████████████████

██████████████████████████ 614 F.3d at 68.

*Second,* ████████████████████████████████████

████ App.Br. 54. Again, even if that were true,[19] it doesn't matter. The

antitrust laws guarantee an opportunity to compete, not a right to *win*.

*See Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d

976, 982-83 (9th Cir. 1989) ("fail[ing] to outbid" competitors not actiona-

ble). Regardless of whether Fresenius was unable or unwilling to secure

a contract with BCN, it had every chance to make a competitive offer.

Fresenius's assertion of futility is also myopic. ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[19] ████████████████████████████████████████████
████████████████████████████████ D.E. 201-21, at 6. It had

plenty of room to bid.

████████████████████████████████████████████

████ 6JA1345-47, 1394, 1410, 1415-18. That Fresenius did not realize

the value of a contract until it was too late is not antitrust injury.

*Finally,* ████████████████████████████████████

████████████████ App.Br. 53. ███████████████████

███████████████ ████████████—but even setting that aside, these ex-

cuses are of no import. ████████████████ ████ █████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████ 6JA1338-42; 6JA1598-99; 5JA1122-25. ██████

████████████████████████████████████████████

█████████ And its witnesses' legal opinions do not create a factual dis-

pute. *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (6th Cir. 2009);

*Ashton v. Whitman*, 94 F.App'x 896, 901 n.2 (3d Cir. 2004).

████████████████████████████████████████████

██████████████ [20] Regardless, an "ethical canon" is "not a reason, cog-

nizable under the Sherman Act, for doing away with competition." *Nat'l*

---

[20] ████████████████████████████████████████

███████████████ 12JA3485; 19JA5645-46.

*Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 696 (1978). No case holds that a plaintiff suffers antitrust injury where it is free to compete, but declines because it finds the conditions distasteful. *Cf. United States v. Line Material Co.*, 333 U.S. 287, 309-10 (1948) (Sherman Act requires competition, despite any "evil social effect of cutthroat competition on producers and consumers"). A plaintiff who "refuse[s], based on principle," to compete for a contract does not suffer antitrust injury. *El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F.Supp.2d 612, 621 (S.D. Tex. 2003), *aff'd*, 131 F.App'x 450 (5th Cir. 2005).

Fresenius has no valid excuse. It may not have wanted to compete, but it had every opportunity. That is all the Sherman Act requires.

## C.    The District Court Did Not Weigh Evidence.

Fresenius argues, without legal authority, that the district court "weigh[ed] the evidence and constru[ed] it against" Fresenius when it observed that Fresenius was "'unwilling' to bid on a contract with BCN." App.Br. 53. ████████ ███████ █████████████████████ █████ 7JA1916; 5JA1009-10; D.E. 179, at 112, 118, 121-24. Fresenius is entitled to reasonable inferences, but it is not reasonable to infer that █████████████████████████████████████████

████████████ *See Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp.*, 786 F.2d 564, 581 (3d Cir. 1986) (court "cannot ignore uncontested facts that render inferences unreasonable, or … fantastic") (quotation omitted).

## III.  PAR DID NOT SUBSTANTIALLY FORECLOSE COMPETITION.

Fresenius alleges that Par had exclusive agreements with BCN, Bachem, and PolyPeptide. Assuming that were true (it's not), Fresenius still could not succeed on its claims because it has not produced evidence of anticompetitive harm. The undisputed facts are to the contrary: *seven* other competitors accessed widely-available API and developed vasopressin injection. The Court may affirm summary judgment for Par on this independent ground, which was raised but not decided below.

Exclusive dealing "generally pose[s] little threat to competition." *ZF Meritor*, 696 F.3d at 270. It is not illegal unless it "substantially forecloses" competition. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 333-34 (1961).[21] Conduct that "merely disadvantage[s] rivals," *ZF Meritor*, 696 F.3d at 271, or excludes "one or even several competitors," *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984),

---

[21] "The applicable law is the same" for all federal and state-law exclusive dealing claims. *Eisai*, 821 F.3d at 402 & n.11.

is not itself unlawful. "There must be proof that competition, not merely competitors, has been harmed." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005).

The relevant question is whether the exclusive arrangements "foreclose so large a percentage of the available supply or outlets" that competition in "the market in which the parties compete" is "unreasonably constricted." *ZF Meritor*, 696 F.3d at 284 (quotation omitted).[22] There is no "anticompetitive threat" unless "the defendant has a significant position in both the upstream and downstream markets"—here, the API market and the vasopressin injection market, respectively. Areeda & Hovenkamp, *Antitrust Law* ¶ 1803a (2020 supp.).

Fresenius does not attempt to make this showing. ██████████ ████████████████████████████████████████████████ This is not just a technical failure to define a market in the antitrust sense; the rec-

---

[22] *See, e.g.*, *ZF Meritor*, 696 F.3d at 286-87 (Eaton had contracts with "every direct purchaser"); *Dentsply*, 399 F.3d at 195-96 (Dentsply's exclusive dealers held "dominant position" in dealer market, "leaving only a small sliver" for Dentsply's competitors); *LePage's, Inc. v. 3M*, 324 F.3d 141, 160-61 & n.14 (3d Cir. 2003) (en banc) (3M all but entirely cut off rivals' access to market for high-volume superstores).

ord contains no evidence showing the percentage of API that Par suppos-

edly controlled. At most, ███████████████████████████████

███ ███████ ███████████ but that is not harm to *competition. See*

*Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983)

(losing access to the "best, most efficient[,] and cheapest source of supply"

is not "economic injustice") (quotation omitted). On this record, no jury

could find that Par "foreclosed competitors from a substantial percent-

age"—or *any* particular percentage—of "available opportunities" in the

API market. *Dentsply*, 399 F.3d at 190.

## A.    There Is No Evidence That Par Controlled a Substantial Percentage of Vasopressin API.

To determine whether Par controlled a substantial percentage of

vasopressin API, one would have to "look at all relevant sources of supply,

either actual rivals or eager potential entrants," and "provide the numer-

ator and the denominator in the fraction labeled 'market share.'"

*SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978).

Incredibly, Fresenius never tried to do this.

Fresenius's economist, Dr. Bell, did not perform this analysis.

7JA1800. At deposition, he testified: ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

7JA1799. █████████████████████████████████████

████████████████████ 7JA1773. Without knowing the suppliers or the quantity of available API supply, no reasonable jury could determine the percentage Par allegedly controlled. That requires summary judgment for Par. *See Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 718, 722, 727-28 (3d Cir. 1991) (no competitive harm where defendants denied tractor dealership supply of Ford tractors, but defendants lacked power in market for tractors); *Cascade Cabinet Co. v. W. Cabinet & Millwork Inc.*, 710 F.2d 1366, 1368-72 (9th Cir. 1983) (affirming summary judgment for defendant that denied competitor access to manufacturing site, since defendant lacked power in real-estate market).

██████████████████████████████████████████

███████████████████████ App.Br. 1, 8, 31. ████████████████ ██

██ ██████████████████████████████████████████

██ [23] That naked assertion cannot be squared with undisputed facts.

---

[23] Fresenius cites the district court's opinion, App.Br. 8, but omits an important qualifier: BCN, Bachem, and PolyPeptide were "the only three API suppliers *with DMFs* at the time." Op. 2 (emphasis added).

██████  ████  ████████████████████████████████████████

████████████████████████████████████████████████ D.E. 179, at

128-36; 7JA1925-91, 8JA1992-2035. To state the obvious, *willing* suppli-

ers are "actual rivals or eager potential entrants." *SmithKline*, 575 F.2d

at 1063. The "indisputable existence of alternative sources of supply …

negates the existence of anticompetitive effects." *Orson, Inc. v. Miramax*

*Film Corp.*, 79 F.3d 1358, 1372 (3d Cir. 1996).

Maybe Fresenius views the API market as limited to DMF holders.

Not only is that position unsupported by economic analysis,[24] it is belied

by "commercial realities." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,

124 F.3d 430, 436 (3d Cir. 1997). Since the FDA does not substantively

review a DMF until an NDA or ANDA references it, pharmaceutical man-

ufacturers often partner with API suppliers that do not yet have DMFs.

5JA1255, 1264-65. What matters is that the supplier submits its DMF *by*

*the time the manufacturer files its NDA or ANDA for review.* 6JA1476;

10JA2877-79; 19JA5682-83; D.E. 167-22, 45:2-47:14. That explains why,

as Fresenius's Senior Sourcing Director testified, ████████████████

---

[24] *Cf. Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513-14, 520 (3d Cir. 1998) (ordering judgment for defendants where plaintiffs failed to address cross-elasticity of demand).



20JA5970-71.

*Id.*

8JA2136-44.

2JA33.

Fresenius's real complaint is not that Par foreclosed the API market, but that Par prevented Fresenius from buying from its preferred supplier. That does not matter—again, the antitrust laws prevent harm to *competition*, not to any particular competitor. The error is apparent in Bell's analysis.

7JA1770-71.

7JA1771-72; 15JA4232. But a "single purchaser's preferences"—

██████████████████████████████—"cannot define a market." *City of*

*N.Y. v. Group Health Inc.*, 649 F.3d 151, 156 (2d Cir. 2011).

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████ ████████████████████

██████ ██ 15JA4232. █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ *ZF*

*Meritor*, 696 F.3d at 271, 284. That is insufficient as a matter of law, since

"[o]ne competitor's inability to compete does not automatically mean com-

petition has been foreclosed." *Eisai*, 821 F.3d at 403-04.

### B.    The Undisputed Evidence Shows That Other Companies Had Ready Access To Vasopressin API.

Because Fresenius has not shown that Par controlled a substantial

percentage of vasopressin API, this Court should affirm summary judg-

ment. *See Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168,

1173-74 (9th Cir. 1988) (affirming summary judgment where plaintiff

"did not show that MMM was the only, or even the controlling source of

surplus milk"). Fresenius may retort that it is enough to show that when

████████████████████████████████████████████████

██████████████████████████████████████ App.Br. 9. Even as-
suming that sort of evidence could meet Fresenius's burden, there isn't
any here. Fresenius's contention is belied by undisputed facts.

For one thing, *five* companies filed an ANDA or NDA ████████
████ meaning they all found sufficient API to "begin developing" and fil-
ing ANDAs during the relevant years. *Two more* acquired API and devel-
oped compounded vasopressin injections. That is the opposite of foreclo-
sure. *See Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group
LP*, 592 F.3d 991, 998 (9th Cir. 2010). Nor is there a shred of evidence
that "Par delayed Fresenius Kabi *and other generic drug manufacturers*
from entering the market." App.Br. 2 (emphasis added). Fresenius does
not point to anything showing that Par's alleged exclusive agreements
caused any of the five ANDA/NDA filers to delay their applications, or
that anyone else would have filed an ANDA if not for Par.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ 19JA5737-41. ██████████

████████████████████████████████████████████████

████████████████████████████ 19JA5744-45. █████████████

███████████████████████████████ 19JA5745-46.

████████████████████████████████████████

████████████████████████████████████████

App.Br. 13. That does not indicate foreclosure. There is no evidence that customers could not find API elsewhere, or that a lack of API caused them to delay or abandon ANDAs.[26] It is sheer conjecture to conclude that Par prevented them from competing. *Cf. ZF Meritor*, 696 F.3d at 290 (unlike Fresenius, plaintiff addressed "whether foreclosure … could be attributed to factors other than the [exclusive agreements]").

Again, this total failure of proof mandates judgment for Par. *See Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1234-35 (8th Cir. 1987) (no foreclosure where there was "no evidence" that exclusive deals had "any impact on the ability of Ryko's competitors to make sales presentations

---

[25] ███████████████████████████████████████
████████████████████████████████████ 19JA5672-73, 5679-80; D.E. 181-11, 21:13-25; D.E. 182-76; D.E. 182-57.

[26] ███████████████████████████████████████
████████████████████ 6JA1695; D.E. 169-18, at -190; D.E. 201-14, 179:5-181:3.

to any potential customer"). Fresenius wants the Court to *assume* that Par caused everyone to delay their ANDAs, but that "*post hoc ergo propter hoc*" logic cannot defeat summary judgment. *Roger Whitmore's Auto. Servs., Inc. v. Lake Cty.*, 424 F.3d 659, 669 (7th Cir. 2005).

This Court should affirm on the additional ground that Fresenius cannot prove substantial foreclosure. *Eisai*, 821 F.3d at 403-07.

## IV. FRESENIUS DID NOT ADDUCE EVIDENCE OF TORTIOUS INTERFERENCE.

By failing to independently address tortious interference, Fresenius concedes that its tort claim falls with its antitrust claims—and waives any argument to the contrary. *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005). As the district court recognized, Fresenius's inability to prove causation is fatal to *all* of its claims. Op. 6 n.6.

Even if Fresenius could prove causation, its tort claim fails because there is no evidence that Fresenius had a reasonable expectation of economic benefit. ███████████████ App.Br. 10, but even a "nine-year business relationship" does not create a reasonable expectancy, *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 39 (N.J. 1989). A plaintiff must show it "was in 'pursuit' of [the] business" of which it was deprived. *Id.* at 37. In *Printing*

*Mart*, the plaintiff had a reasonable expectation because it "*engaged in the bidding*" when it "received [an] offer to submit a bid." *Id.* at 39 (emphasis added). ██████████████████████████████████████

██████████████████████████ 7JA1916; 5JA1009-10.

Nor is there any evidence of tortious conduct. In "cases involving parties in direct competition"—like this one—tortious interference requires proof of "fraudulent, dishonest, or illegal" actions. *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 659 A.2d 904, 936 (N.J. Super. Ct. App. Div. 1995); *see Mylan Inc v. SmithKline Beecham Corp.*, 723 F.3d 413, 422-23 (3d Cir. 2013) (same). Sharp elbows, or even "sneaky" or "underhanded" conduct, do not suffice. *C.R. Bard, Inc. v. Wordtronics Corp.*, 561 A.2d 694, 697-98 (N.J. Super. Ct. Law Div. 1989).

Fresenius cannot point to any "fraudulent, dishonest, or illegal" conduct. ██████████████████████████████████████████

████████████████████████████████████ App.Br. 10. Par was entitled to "engage in the sharpest competition," including "by holding out extraordinary inducements." *Lamorte Burns & Co. v. Walters*, 770 A.2d 1158, 1170 (N.J. 2001) (quotation omitted).

There is no genuine dispute that Fresenius cannot succeed on its tortious interference claim.

## CONCLUSION

For these reasons, the judgment below should be affirmed.

Dated:  August 31, 2020        Respectfully submitted,

By: */s/ Brett J. Williamson*

> Benjamin G. Bradshaw
> O'MELVENY & MYERS LLP
> 1625 Eye Street, N.W.
> Washington, D.C. 20006
> (202) 383-5300
>
> Brett J. Williamson
> Anton Metlitsky
> Carolyn Wall
> O'MELVENY & MYERS LLP
> Times Square Tower
> 7 Times Square
> New York, N.Y. 10036
> (212) 326-2000
>
> Stephen J. McIntyre
> O'MELVENY & MYERS LLP
> 400 South Hope Street
> Los Angeles, Cal. 90071
> (213) 430-6000
>
> *Counsel for Appellees Par Sterile*
> *Products, LLC and Par Pharma-*
> *ceutical Companies, Inc.*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). This brief contains 12,993 words, excluding the Glossary and portions of the brief exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.


Dated:  August 31, 2020          By: */s/ Brett J. Williamson*

# CERTIFICATE OF COMPLIANCE WITH COURT RULES

Pursuant to Circuit Rule 28.3(d), Par certifies that Brett J. Williamson, Benjamin G. Bradshaw, Anton Metlitsky, and Stephen J. McIntyre are admitted to the bar of this Court.

Pursuant to Circuit Rule 31.1(c), Par certifies that the text of the PDF-formatted electronic brief is identical to the text of the briefs submitted to the Court in paper copy, and that a virus detection program, Windows Defender Security Center, has been run on the electronic file, and no virus was detected.

Dated:  August 31, 2020                    By: */s/ Brett J. Williamson*

# CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury that under the laws of the United States of America that the above is true and correct.

Dated:  August 31, 2020             By: */s/ Brett J. Williamson*